UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DONG CHUL KIM,

Plaintiff,

-v.-

HARTE HANKS, INC., HARTE-HANKS
DIRECT, INC., HARTE-HANKS
STRATEGIC MARKETING, INC., and
NSO, INC.,

Defendants.

19 Civ. 1920 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Dong Chul Kim brings this suit against Defendants Harte

Hanks, Inc., Harte-Hanks Direct, Inc., Harte-Hanks Strategic Marketing, Inc.,

and NSO, Inc., all of whom he alleges operated as a single entity that jointly

employed him.  Plaintiff, who is a native Korean, alleges that he was treated

differently from his white, American-born colleagues; was made to handle the

more technical and less desirable workplace tasks because of his ethnicity as

an East Asian male; and was terminated for complaining about this disparate

treatment.  Plaintiff claims discrimination and retaliation under both 42 U.S.C.

§ 1981 and the New Jersey Law Against Discrimination (the "NJLAD"), N.J.S.A.

§§ 10:5-1 to 10:5-49.

Defendants seek the dismissal of Plaintiff's NJLAD claims on the grounds

that they are time-barred; that they cannot be brought against certain

Defendants who did not employ Plaintiff; and that they cannot be asserted by

Plaintiff because he was not employed in New Jersey.  Defendants also seek the

dismissal of the entirety of Plaintiff's complaint against Defendants Harte

Hanks, Inc., Harte-Hanks Strategic Marketing, Inc., and NSO, Inc. on the

grounds that the Court cannot exercise personal jurisdiction over them.  For

the reasons set forth in the remainder of this Opinion, Defendants' motion to

dismiss is granted in part and denied in part.

## BACKGROUND[1]

### A.    Factual Background

#### 1.    Plaintiff's Employment at Harte Hanks[2]

Plaintiff, a 50-year-old Korean native, was recruited to work for Harte

Hanks by Robert Fuller, with whom Plaintiff had previously worked.  (Compl.

¶¶ 25-26).  At the time of his discussions with Fuller and others from Harte

Hanks, Plaintiff was living in Arkansas.  (*Id.* at ¶ 27).  However, he openly

discussed the fact that he was planning to move to New Jersey to be closer to

---

[1]    The facts contained in this Opinion are drawn principally from Plaintiff's Amended Complaint, which is the operative pleading in this case and is referred to in this Opinion as the "Complaint" or "Compl." (Dkt. #22).  The Court also draws facts from the exhibits attached to the Declaration of Anthony A. Mingione, Esquire, in Support of Defendants' Motion to Dismiss, referred to as the "Mingione Decl." (Dkt. #27), and the exhibit attached to the Declaration of Gregory N. Filosa in Opposition to Defendants' Motion to Dismiss, referred to as the "Filosa Decl." (Dkt. #35), which are exhibits of which the Court takes judicial notice.  *See Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("[O]n a motion to dismiss, a court may consider documents attached to the complaint as an exhibit or incorporated in it by reference, matters of which judicial notice may be taken, or documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." (internal quotation marks and alterations omitted)); *see generally Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (discussing documents that may be properly considered in resolving a motion to dismiss).

For ease of reference, the Court refers to the parties' briefing as follows: Defendants' opening brief as "Def. Br." (Dkt. #26); Plaintiff's opposition brief as "Pl. Opp." (Dkt. #34); and Defendants' reply brief as "Def. Reply" (Dkt. #38).

[2]    In this section of the Opinion, the Court adopts Plaintiff's convention of using "Harte Hanks" and the "Company" to refer to the Defendants collectively, since Plaintiff's Complaint does not distinguish among Defendants.  (*See generally* Compl.).

his family.  (*Id.*).  Harte Hanks did not have an office in New Jersey, but the Company offered to let Plaintiff work from a home office in New Jersey.  (*Id.*). As part of his employment offer, Harte Hanks reimbursed Plaintiff for $3,000 in moving costs for Plaintiff to move from Arkansas to New Jersey.  (*Id.* at ¶ 29).

Plaintiff began work at Harte Hanks in April 2013 as a Senior Project Manager and immediately excelled in his employment.  (Compl. ¶¶ 24-25, 30). In his 2014 performance review, Plaintiff's supervisor described Plaintiff as a "strong performer and a critical member of the team."  (*Id.*).  In recognition of his performance, Plaintiff was promoted to a Product Planning Manager in January 2015.  (*Id.* at ¶ 31).

Throughout Plaintiff's employment with Harte Hanks, he worked almost exclusively from his home office in New Jersey.  (Compl. ¶¶ 28, 34, 37).  Harte Hanks provided Plaintiff with equipment, including a laptop and other accessories, that allowed him to accomplish his work remotely.  (*Id.* at ¶ 32). Harte Hanks also provided Plaintiff with online subscriptions for working remotely, including Skype, Microsoft Sharepoint, BaseCamp, IBM Connections, Trello, and other software programs.  (*Id.* at ¶ 33).  Plaintiff routinely made and received phone calls and sent and received email communications from his home office in New Jersey.  (*Id.* ¶ 35).  Indeed, over the course of Plaintiff's three years of employment at Harte Hanks, he traveled to the Company's Pennsylvania office (the "Pennsylvania Office") only when someone scheduled a meeting that required his personal attendance, which amounted to fewer than 20 times.  (*Id.* at ¶¶ 36, 38).  Every time Plaintiff was required to travel to the

Company's Pennsylvania Office, he was reimbursed for travel expenses. (*Id.* at ¶¶ 36, 38).

In September 2015, Plaintiff participated in a telephone call with Nina Hall, a Human Resources representative with Harte Hanks. (Compl. ¶ 39). On the call, Plaintiff asked Hall whether she could confirm Plaintiff's remote working arrangement in writing. (*Id.*). In response, Hall told Plaintiff that it was not necessary to do so because there was a clear understanding when Plaintiff was hired that he would be working remotely. (*Id.*).

In June 2015, Plaintiff's supervisor left his position with Harte Hanks and Plaintiff was assigned to report to Natalie Bush, Vice President of Customer Experience Enablement. (Compl. ¶ 40). Following this change in reporting structure, Plaintiff was subjected to disparate treatment by his younger, white, and American born-managers and co-workers that he believed to be based on his age, race, ancestry, and/or ethnicity. (*Id.* at ¶ 41). Almost immediately after Plaintiff began reporting to Bush, she and other managers removed many of Plaintiff's key responsibilities from him, such as the status reports he provided to senior leadership, his formal contract liaison responsibilities, and his provision of support functions to other departments. (*Id.* at ¶ 42). These and other key assignments were redistributed to his younger, white, and American-born co-workers. (*Id.*). Plaintiff was also routinely excluded from work-related emails among the product team; in many instances, Plaintiff had to ask specifically for certain emails in order to receive

them.  (*Id.* at ¶ 43).  Plaintiff's younger, white, and American-born co-workers were not similarly excluded from these communications.  (*Id.*).

After this treatment continued for approximately three months, Plaintiff reported to Hall that he believed he was being treated differently as a result of his age, race, national origin, and/or ethnicity.  (Compl. ¶ 44).  Hall purportedly looked into Plaintiff's concerns and claimed to find no evidence of discrimination.  (*Id.* at ¶ 45).  However, Hall told Plaintiff that Frank Grillo, the Company's newly-hired Chief Management Officer, would now be responsible for resource management and resolving internal conflicts for the Product Team, and she suggested that Plaintiff speak with Grillo to clarify Plaintiff's role on the team going forward.  (*Id.*).

Plaintiff followed Hall's recommendations, but his marginalization (and, by extension, his concerns) only worsened.  (Compl. ¶ 46).  Grillo demoted Plaintiff from a product planning role to a project management role, and additional responsibilities were taken away from Plaintiff.  (*Id.*).  When he changed Plaintiff's role, Grillo told Plaintiff that he did not see Plaintiff as a successful product manager — despite the fact that Plaintiff had been successfully doing product management work for the preceding two-and-a-half years with excellent reviews.  (*Id.* at ¶ 47).  When Plaintiff pressed Grillo for specific reasons for this belief, Grillo could not elaborate beyond saying, "that's how I see you."  (*Id.* at ¶ 48).  Grillo also told Plaintiff that this was his "seat on the bus."  (*Id.*).  To Plaintiff, this indicated a tacit confirmation of Grillo's bias.  (*Id.*).  Plaintiff was given no explanation for the significant reduction in his role

and no other choice but to accept the demotion, since he needed the job. (*Id.* at ¶ 49).

From December 2015 through April 2016, Plaintiff continued to receive conflicting advice from Bush and Grillo regarding his role at Harte Hanks. (Compl. ¶ 50). Plaintiff also continued to be marginalized by the younger white and/or American-born members of the team and felt like he was being treated like a contractor rather than a fellow colleague. (*Id.* at ¶ 51). In April 2016, one of Plaintiff's younger, white, American-born colleagues told Plaintiff that he (the colleague) needed to focus on meeting people and, as a result, he needed Plaintiff to handle his more technical (and less desirable) tasks so that, in the colleague's words, "I don't have to think about it." (*Id.* at ¶ 52). Plaintiff felt that he was being expected to handle the more technical and less desirable tasks because of his ethnicity as an East Asian male. (*Id.* at ¶ 53). Because of his work ethic and commitment to Harte Hanks, Plaintiff continued to handle the work that no one else wanted to do and successfully completed all the tasks he was assigned. (*Id.*).

On April 26, 2016, Plaintiff elevated his concerns to Bush and cited what he perceived as a double standard. (Compl. ¶ 54). In response, Bush suggested that they schedule a conference call with Grillo for the following day, Wednesday, April 27, 2016. (*Id.*). In advance of the call, Plaintiff sent Grillo and Bush a research study discussing stereotypes faced by East Asian males in the workplace; Plaintiff believed this study offered support for the discrimination that he believed he was experiencing. (*Id.* at ¶ 55).

Any hope that the April 27 conference call would resolve Plaintiff's issues was short-lived: Before Plaintiff could even voice his concerns, Grillo cut him off and told him, "if Natalie can't use you the way she needs to use you then you have no value to me," before hanging up the phone. (Compl. ¶ 56). Plaintiff and Bush were shocked by Grillo's conduct, but the two of them continued their discussion. (*Id.* at ¶ 57). While Bush attempted to address Plaintiff's concerns, it was clear that without Grillo she could not provide the role clarity that Plaintiff was seeking. (*Id.*). For his part, Plaintiff again reiterated that he felt that he was being treated differently because of his race, national origin, and/or ethnicity. (*Id.* at ¶ 58). Bush concluded the call by telling Plaintiff to give it some thought and let her know by the end of the week how he wanted to move forward. (*Id.*). At no point during the call did Bush intimate that Plaintiff's job was in jeopardy. (*Id.* at ¶ 59).

The next day, Hall scheduled a telephone call with Plaintiff for that Friday, April 29, 2016. (Compl. ¶ 60). On the April 29, 2016 call, Hall terminated Plaintiff's employment. (*Id.*). Hall told Plaintiff that his termination was not based on his performance, but on the fact that Plaintiff was "not a fit right now." (*Id.*). During the call, Hall told Plaintiff that she would not have encouraged him to complain to Grillo about discrimination or to send a study that he believed supported his concerns. (*Id.* at ¶ 61).

### 2. The Harte Hanks Entities

Plaintiff names several entities as Defendants in this lawsuit, all of whom he alleges were his employers. (Compl. ¶¶ 8, 17). Defendant Harte Hanks, Inc.

("HHI") is incorporated in Delaware and maintains its headquarters in Texas. (*Id.* at ¶ 3). Defendant Harte-Hanks Direct, Inc. ("HHD") is incorporated in New York and maintains its principal place of business in Pennsylvania. (*Id.* at ¶ 4). Defendant Harte-Hanks Strategic Marketing, Inc. ("HHSM") is incorporated in Delaware and maintains its principal place of business in Massachusetts. (*Id.* at ¶ 5). Defendant NSO, Inc. ("NSO") is incorporated in Ohio and maintains its principal place of business in Texas. (*Id.* at ¶ 6).

Plaintiff claims that the four Defendants operated as a single integrated enterprise that jointly employed him. He refers to them collectively as the "Company" or "Harte Hanks" without distinguishing among them in his Complaint. Plaintiff alleges the following facts in support of his claim that Defendants operated as a unified enterprise:

- HHI is the parent corporation and 100% owner of the other Defendants, HHD, HHSM, and NSO. (Compl. ¶¶ 14-16).

- Plaintiff was hired by the Company in April 2013 and was initially paid by HHSM — and received IRS Form W2s from this entity for 2013 and 2014. In 2015, Plaintiff's pay stubs and IRS Form W2s were issued by NSO. The Company provided Plaintiff with no notice of this change and there was no other change in the terms and conditions of Plaintiff's employment with the Company. (*Id.* at ¶¶ 18-20).

- The Company presents itself to the public as a single company, and maintains a single website (hartehanks.com) for the Company and all of its subsidiaries; when Plaintiff applied for employment with the Company, the Company did not differentiate among HHI and its subsidiaries. (*Id.* at ¶ 21).

- The operations of the different subsidiaries of the Company are interrelated, such that Plaintiff frequently worked with and assisted individuals employed by different Harte Hanks entities in the performance of their shared business purposes. (*Id.* at ¶ 22).

- Defendant HHI exercises centralized control over human resources and labor relations policies and practices for its subsidiaries, including, but not limited to, Defendants HHI, HHSM, and NSO. For example, Plaintiff was notified of his termination by Nina Hall, who, upon information and belief, is an employee of Defendant HHI. (*Id.* at ¶ 23).

## B.     Procedural Background

On July 14, 2016, a month-and-a-half after being terminated, Plaintiff filed a complaint with the New Jersey Division on Civil Rights. (Compl. ¶ 12; Filosa Decl., Ex. A). On April 19, 2018, Plaintiff filed a complaint in state court in New Jersey against Defendant HHI. (Compl. ¶ 12). On May 25, 2018, HHI removed the complaint to the United States District Court for the District of New Jersey. (*Kim* v. *Harte-Hanks Direct, Inc.*, No. 2:18 Civ. 9689 (MCA) (LDW) (D.N.J. May 25, 2018), Dkt. #1). Plaintiff then amended the complaint in the District of New Jersey and added the remaining Defendants. (*Id.* at Dkt. #4). On July 11, 2018, Defendants filed a motion to dismiss in the District of New Jersey, arguing that: (i) the State of New Jersey did not have personal jurisdiction over Defendants and (ii) the NJLAD did not apply to Defendants. (*Id.* at Dkt. #11). On January 31, 2019, the district court dismissed Plaintiff's claim on personal jurisdiction grounds. (Compl. ¶ 12; *see* Mingione Decl., Ex. 2).

On February 28, 2019, Plaintiff filed the instant action in this Court. (Dkt. #1). The Court held a conference in the case on May 22, 2019. (Dkt. #30 (transcript)). On May 29, 2019, Plaintiff filed an amended complaint. (Dkt. #22). On July 8, 2019, Defendants filed a motion to dismiss the Complaint on the grounds that (i) Plaintiff's NJLAD claims are barred by the statute of limitations; (ii) Plaintiff cannot assert NJLAD claims because he was not employed in New Jersey; (iii) Plaintiff cannot assert NJLAD claims against Defendants HHI, HHSMI, and NSO because they were not his "employers"; and (iv) the Court lacks personal jurisdiction over Defendants HHI, HHSM, and NSO. (Dkt. #25, 26). Defendants also filed two declarations in support of their motions. (Dkt. #27, 28). Plaintiff filed an opposition brief and supporting declaration on August 12, 2019. (Dkt. #34, 35). Defendants filed a reply brief on August 26, 2019. (Dkt. #38).

## DISCUSSION

### A. The Court Grants Defendants' Motion to Dismiss Certain Defendants for Lack of Personal Jurisdiction

#### 1. Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(2)

When a defendant brings a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *DiStefano* v. *Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (citation omitted); *accord In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013). "Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the

motion by pleading in good faith, legally sufficient allegations of jurisdiction. At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations." *Dorchester Fin. Sec., Inc.* v. *Banco BRJ, S.A.*, 722 F.3d 81, 84-85 (2d Cir. 2013). All jurisdictional allegations "are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor[.]" *A.I. Trade Fin., Inc.* v. *Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993). However, the court "will not draw argumentative inferences in the plaintiff's favor" and need not "accept as true a legal conclusion couched as a factual allegation[.]" *In re Terrorist Attacks*, 714 F.3d at 673; *see also Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012).

District courts deciding motions to dismiss for lack of personal jurisdiction typically engage in a two-part analysis. The Court must find both that: (i) state law provides "a statutory basis for exercising personal jurisdiction," *Marvel Characters, Inc.* v. *Kirby*, 726 F.3d 119, 128 (2d Cir. 2013); and (ii) the exercise of personal jurisdiction comports with due process, *Sonera Holding B.V.* v. *Çukurova Holding A.Ş.*, 750 F.3d 221, 224 (2d Cir. 2014).

### a. New York's Long-Arm Statute

It is well established that "[a] district court's personal jurisdiction is determined by the law of the state in which the court is located." *Spiegel* v. *Schulmann*, 604 F.3d 72, 76 (2d Cir. 2010). New York's long-arm statute, specifically, N.Y. C.P.L.R. § 301, authorizes a court to exercise general personal jurisdiction over a corporation if it has "engaged in such a continuous and systematic course of 'doing business' [in New York] that a finding of its

11

'presence' in this jurisdiction is warranted." *Landoil Res. Corp.* v. *Alexander & Alexander Servs., Inc.*, 77 N.Y.2d 28, 33 (1990). The "doing business" standard entails a high threshold showing. "[A] corporation is 'doing business' and is therefore 'present' in New York and subject to personal jurisdiction with respect to any cause of action, related or unrelated to the New York contacts, if it does business in New York 'not occasionally or casually, but with a fair measure of permanence and continuity.'" *Hoffritz for Cutlery, Inc.* v. *Amajac, Ltd.*, 763 F.2d 55, 58 (2d Cir. 1985) (quoting *Tauza* v. *Susquehanna Coal Co.*, 220 N.Y. 259, 267 (1917)). This is necessarily a fact-intensive inquiry that requires a district court to "analyze a defendant's connections to the forum state not for the sake of contact-counting, but rather for whether such contacts show a continuous, permanent and substantial activity in New York." *Landoil Res. Corp.* v. *Alexander & Alexander Servs., Inc.*, 918 F.2d 1039, 1043 (2d Cir. 1990) (internal quotation marks omitted).

New York's long-arm statute also authorizes courts to exercise specific personal jurisdiction "over any non-domiciliary ... who in person or through an agent ... transacts any business within the state," so long as the cause of action "aris[es] from" that transaction. N.Y. C.P.L.R. § 302(a)(1). Accordingly, a court may exercise specific personal jurisdiction over a non-domiciliary if two conditions are met: "first, the nondomiciliary must 'transact business' within the state; [and] second, the claim against the nondomiciliary must arise out of that business activity." *CutCo Indus., Inc.* v. *Naughton*, 806 F.2d 361, 365 (2d Cir. 1986). In assessing whether a defendant has "transacted business" in the

state, the Court looks to "the totality of the defendant's activities within the forum." *Continental Indus. Grp., Inc.* v. *Equate Petrochemical Co.*, 586 F. App'x 768, 770 (2d Cir. 2014) (summary order) (citing *Best Van Lines, Inc.* v. *Walker*, 490 F.3d 239, 246 (2d Cir. 2007)). "New York courts define transacting business as purposeful activity — some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State." *Continental Indus.*, 586 F. App'x at 770.

### b. Due Process Requirements of Personal Jurisdiction

"The Due Process Clause of the Fourteenth Amendment constrains a State's authority to bind a nonresident defendant to a judgment of its courts." *Walden* v. *Fiore*, 571 U.S. 277, 283 (2014). A State may authorize its courts to exercise personal jurisdiction over an out-of-state defendant if the defendant has "certain minimum contacts with [the State] such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co.* v. *Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). The Court's decision in *International Shoe* presaged the developed of the two categories of personal jurisdiction under the Due Process Clause: specific and general. *See generally Daimler AG* v. *Bauman*, 571 U.S. 117, 126-29 (2014) (discussing categories).

Consistent with due process, "[a] court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State."

*Goodyear Dunlop Tires Operations, S.A.* v. *Brown*, 564 U.S. 915, 919 (2011)

(quoting *International Shoe,* 326 U.S. at 317).  Aside from "an exceptional case,"

a corporation is at home (and thus subject to general jurisdiction, consistent

with due process) only in a state of its: (i) incorporation or (ii) principal place of

business.  *Daimler*, 571 U.S. at 137-39 & n.19; *see Brown* v. *Lockheed Martin*

*Corp.*, 814 F.3d 619, 627 (2d Cir. 2016) ("[I]n our view *Daimler* established that,

except in a truly 'exceptional' case, a corporate defendant may be treated as

'essentially at home' only where it is incorporated or maintains its principal

place of business — the 'paradigm' cases.").  The Second Circuit has recognized

that the Supreme Court's decision in *Daimler* expressly casts doubt on previous

Supreme Court and New York Court of Appeals cases that permitted a court to

exercise general jurisdiction over a foreign corporation on the basis that it was

doing business through a local branch office in the forum.  *Gucci America, Inc.*

v. *Weixing Li*, 768 F.3d 122, 135 (2d Cir. 2014).

"In contrast to general, all-purpose jurisdiction, specific jurisdiction is

confined to adjudication of issues deriving from, or connected with, the very

controversy that establishes jurisdiction."  *Goodyear*, 564 U.S. at 919 (internal

quotation marks omitted).  For a court to exercise specific jurisdiction over a

defendant, consistent with due process, the suit must arise from or relate to

the defendant's contacts with the forum.  *Bristol-Myers Squibb Co.* v. *Superior*

*Court of California, San Francisco Cty.*, 137 S. Ct. 1773, 1780 (2017).  This

requires an analysis of whether the defendant purposefully directed his activity

at the forum state.  *See Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462, 472 (1985).

2.    **Analysis**

a.    **The Court May Not Exercise Personal Jurisdiction over the Out-of-State Defendants Consistent with Due Process**

Both parties agree that the Court can exercise general personal jurisdiction over Defendant HHD, as that entity is incorporated in New York. (*See* Def. Br. 17 n.7; Pl. Opp. 5).  As Plaintiff concedes, however, the remaining Defendants are neither incorporated nor maintain their principal places of business in New York.  Plaintiff argues that the Court may nonetheless exercise general personal jurisdiction over the out-of-state Defendants, HHSM, HHI, and NSO, by virtue of the Court's exercise of general personal jurisdiction over HHD, since these Defendants operated as a single integrated business enterprise.

To exercise general personal jurisdiction over the out-of-state Defendants consistent with *Daimler*, the Court must find that the contacts of the out-of-state Defendants have been so continuous and systematic as to essentially render them at home in New York.  *See Daimler*, 571 U.S. at 137-38 ("*Goodyear* made clear that only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there.").  Based on the facts alleged in the Complaint the Court cannot find that the out-of-state Defendants are at home in New York.

Plaintiff alleges that HHD (the New York-incorporated entity) is 100% owned by Defendant HHI, and, further, that Defendant HHI owns a 100%

interest in the other Defendants. (Compl. ¶¶ 14-16). In support of his theory that Defendants operate as a single integrated employer, Plaintiff alleges that: (i) he was paid originally by HHSM and then NSO; (ii) the Company presents itself to the public as a single company and maintains a single website; (iii) when Plaintiff applied for employment with the Company, HHI did not differentiate between and among itself and its subsidiaries; (iv) Plaintiff frequently worked with and assisted individuals employed by the other entities; (v) HHI exercises centralized control over human resources and labor relations policies and practices for its subsidiaries; and (vi) Plaintiff was terminated by an employee of HHI. (*Id.* at ¶¶ 18-23). In essence, Plaintiff's theory is that because the different Harte Hanks entities shared certain resources and presented themselves to the public as a single company, the Court can exercise personal jurisdiction over all of them.

However, these allegations do not support Plaintiff's argument that the out-of-state Defendants had continuous and systematic contact *with New York* such that they are at home here. Plaintiff's allegations support the conclusion that some of the Defendants' contacts can be imputed to other of the Defendants, but Plaintiff makes no allegations imputing any of the integrated enterprise's activity to HHD specifically, nor does Plaintiff's Complaint contain a single allegation of contact between HHI, HHSMI, or NSO and New York. *See Daimler*, 571 U.S. at 136 (concluding that "there would still be no basis to subject [the foreign corporate parent] to general jurisdiction" in the forum state even assuming that the subsidiary was at home in the forum state and that the

16

subsidiary's contacts could be imputed to the foreign parent); *Hood* v. *Ascent Medical Corp.*, 691 F. App'x 8, 10 (2d Cir. 2017) (summary order) ("[T]he Supreme Court has rejected so expansive an understanding of 'agency' as a basis for general jurisdiction .... [F]oreign corporations may not be subject to general jurisdiction whenever they have an in-state subsidiary or affiliate." (internal quotations and citations omitted)); *Sonera*, 750 F.3d at 226 ("Even assuming ... New York [affiliates'] contacts should be imputed to [out-of-state defendant], they do not shift the company's primary place of business (or place of incorporation) away from Turkey."); *see also Letom Management Inc.* v. *Centaur Gaming, LLC*, No. 17 Civ. 3793 (PAE), 2017 WL 4877426, at *4 (S.D.N.Y. Oct. 27, 2017) (dismissing defendant for lack of personal jurisdiction despite plaintiff's allegation that defendant had "two corporate affiliates that are incorporated in, and do business in, New York").

Indeed, Plaintiff's allegations tend to support the conclusion that the Company was running operations from places other than New York, since HHI, a Delaware corporation with headquarters in Texas, was the corporate entity that exercised "centralized control" over the other Defendants. *See Hood*, 691 F. App'x at 11 (concluding that supporting affidavit did not help plaintiff establish personal jurisdiction over defendants in New York where it alleged that the "US Head Office" for Delaware-based defendants was in Minnesota); *In re Roman Catholic Diocese of Albany, New York, Inc.*, 745 F.3d 30, 40 (2d Cir. 2014) ("[I]t is the Diocese's contacts with the forum, not the forum's residents' contacts with the Diocese in New York, that affect general jurisdiction."); *cf.*

*International Diamond Importers, Inc.* v. *Med Art, Inc.*, No. 15 Civ. 4045 (KMW),

2016 WL 1717217, at *2 (S.D.N.Y. Apr. 27, 2016) (finding plaintiff made a

sufficient threshold showing to warrant jurisdictional discovery where the

plaintiff pleaded facts alleging that the in-state defendant was "dominated by

its [foreign] parent company").  But it is insufficient for Plaintiff to use

generalized assertions of corporate crossover to establish that the out-of-state

Defendants are "at home" in New York.

Plaintiff's argument regarding this Court's decision in *Liu* v. *Canteen 82,*

*Inc.*, No. 17 Civ. 7862 (KPF), 2018 WL 6067228 (S.D.N.Y. Nov. 20, 2018),

misses the mark because *Liu* and the decisions it cites are cases regarding

*specific* personal jurisdiction.[3]  In *Liu* the Court found that a group of three

restaurants, one of which was in New York and the other two of which were in

Connecticut, operated as an integrated business enterprise, and that all three

---

[3]    This Court's decision in *Liu* cites *Franklin* v. *Waters*, No. 16 Civ. 9819 (AKH), 2018 WL
3231660 (S.D.N.Y. Apr. 10, 2018), and *Mao* v. *Sands Bethworks Gaming LLC*, No. 15
Civ. 6252 (JMF), 2016 WL 1717220 (S.D.N.Y. Apr. 28, 2016).  Those were also cases
involving specific jurisdiction.

In *Franklin*, the Court found that it could exercise personal jurisdiction over an out-of-
state defendant that had jointly employed the plaintiff *in New York*.  2018 WL 3231660,
at *3.  In so concluding, the court stated that the defendant's New York "contacts have
a 'substantial nexus' to the underlying claim."  *Id.* at *4.

In *Mao*, the court analyzed the indicia of joint employment in determining whether the
actions of an alleged agent, in New York, could be attributed to the out-of-state
defendant.  2016 WL 1717220, at *2-3.  The court concluded that the relationships
between the defendant and its alleged agent were insufficient to allow the court to
exercise *specific* personal jurisdiction over the defendant on the plaintiffs' wage and
hour claims that arose in New York.

Plaintiff also cites to *Southern New England Telephone Co.* v. *Global NAPs Inc.*, 624 F.3d
123 (2d Cir. 2010), in support of the single enterprise theory.  But that too was a case
of specific jurisdiction, in which the Second Circuit upheld the District of Connecticut's
decision to permit veil-piercing to hold one defendant's parent and sister corporations
liable for actions taken *in Connecticut*.  *See id.* at 128-31, 138-39.

18

restaurants were subject to personal jurisdiction in New York. *Id.* at *4. However, the Court's exercise of personal jurisdiction was clearly based on specific jurisdiction. In that case, the plaintiffs, employees of the defendant restaurants, regularly worked at the New York and Connecticut restaurants and were assigned to drive supplies back and forth between those restaurants. *Id.* at *2-3. Specifically, the plaintiffs alleged that: (i) one individual defendant, Yeh Ching, owned and operated all three restaurants; (ii) all three restaurants operated under her common control; (iii) Ching hired employees and assigned job duties; and (iv) Ching directed the transfer of both employees and materials, including food items, between the restaurants in New York and Connecticut. *Id.* at *5.

These facts were relevant to the Court's personal jurisdiction analysis precisely because the plaintiffs' claims — for wage and hour violations under the Fair Labor Standards Act, *as amended*, 29 U.S.C. §§ 201-219, and the New York Labor Laws, Consolidated Laws 1909, chapter 31 — occurred, in large part, *in New York*. *See id.* at *2-3. The Court was thus able to exercise specific personal jurisdiction over the Connecticut defendants. *See id.* at *4-6 (analyzing whether defendants transacted business within New York pursuant to N.Y. C.P.L.R. § 302(a)(1)).

Here, as Plaintiff explicitly acknowledges, "[b]ecause [he] was employed by Defendants to work from his home in New Jersey and Plaintiff's NJLAD claim arises from Defendant's contacts with New Jersey, Plaintiff does not (and probably could not) argue that this Court's jurisdiction over Defendants is

based on specific jurisdiction." (Pl. Opp. 4 n.2). Plaintiff is correct that the Court could not exercise specific jurisdiction over the out-of-state Defendants, as Plaintiff's claims arise solely out of his employment in New Jersey. Thus, Plaintiff's reliance on the single enterprise theory is misplaced.

### b. The Court Need Not Address Defendants' Arguments Under New York's Long-Arm Statute

Since the exercise of personal jurisdiction over the out-of-state Defendants is plainly impermissible under the Due Process Clause, the Court need not reach the question of whether it would be permissible under New York's long-arm statute. *See Sonera*, 750 F.3d at 224-25 & n.2 (declining to address "scope of general jurisdiction under New York law" where exercising general jurisdiction would be "clearly inconsistent with *Daimler*").[4] Accordingly, the Court grants Defendants' motion insofar as it seeks dismissal of Defendants HHI, HHSM, and NSO from the case on the grounds that the Court lacks personal jurisdiction.

### B. The Court Denies Defendant Harte-Hanks Direct, Inc.'s Motion to Dismiss for Failure to State a Claim

### 1. Motions to Dismiss Under Rule 12(b)(6)

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must "draw all reasonable inferences in Plaintiff's favor, assume all well-pleaded factual allegations to be true, and determine

---

[4]     *See also Hood* v. *Ascent Med. Corp.*, 691 F. App'x 8, 10 (2d Cir. 2017) (summary order) (addressing exercise of personal jurisdiction only under the federal Constitution since that was dispositive); *Thackurdeen* v. *Duke Univ.*, 660 F. App'x 43, 45 (2d Cir. 2016) (summary order) ("Whatever application § 301 might have, however, it is apparent that the exercise of general jurisdiction over defendants would be inconsistent with due process.").

whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (internal quotation marks omitted)). A plaintiff is entitled to relief if he alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge plaintiff's claims across the line from conceivable to plausible." (internal quotation marks and alterations omitted)).

"Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

### 2. Analysis

#### a. Plaintiff's NJLAD Claims Are Not Time-Barred

Defendants' first argument for dismissal of the NJLAD claims is that the claims are barred by the applicable two-year statute of limitations. *See Henry* v. *N.J. Dep't of Human Servs.*, 204 N.J. 320, 324 (2010) (holding that NJLAD

complaint must be filed within two years of the date on which the cause of action accrued). "The purpose behind the two-year statute of limitations is to encourage prompt resolution of claims, particularly in discrimination cases where evidence may be vulnerable to the passage of time." *Id.* at 323-33 (internal quotation marks omitted).

Plaintiff's employment was terminated on April 29, 2016. (Compl. ¶ 60). One-and-one-half months later, Plaintiff filed his complaint with the New Jersey Division on Civil Rights. (Filosa Decl., Ex. A). Plaintiff filed his New Jersey state court complaint against HHD on April 19, 2018, about 10 days prior to the expiration of the two-year limitations period. (Mingione Decl., Ex. 1). HHD then removed Plaintiff's case to the District of New Jersey. (*Kim* v. *Harte-Hanks Direct, Inc.*, No. 2:18 Civ. 9689 (MCA) (LDW) (D.N.J. Jan. 31, 2019), Dkt. #26). Shortly after removing the case, HHD filed a motion to dismiss, arguing that the New Jersey court could not exert personal jurisdiction over it. (*Id.* at Dkt. #3). Plaintiff amended his complaint to add the remaining Defendants in this case and they moved to dismiss on personal jurisdiction grounds on July 11, 2018. (*Id.* at Dkt. #11). The court granted the Defendants' motions to dismiss for lack of personal jurisdiction on January 31, 2019. (*Id.* at Dkt. #26; *see* Mingione Decl., Ex. 2). Twenty-eight days later, on February 28, 2019, Plaintiff filed a complaint in this Court.

Thus, while Plaintiff filed his New Jersey complaint within the two-year limitations period, his New York complaint is untimely. Plaintiff concedes that this action was filed more than two years after the date of accrual of his causes

of action. However, Plaintiff argues that his NJLAD claims should not be dismissed on limitations grounds because they are subject to equitable tolling. The question before the Court, therefore, is whether the limitations period should be tolled from the time when Plaintiff filed his complaint in New Jersey through the time his New Jersey action was dismissed, *and,* if so, whether it should be tolled for the month between when that action was dismissed and when this action was filed.

The parties have briefed this issue assuming that federal law applies to the question of whether Plaintiff's NJLAD claims are subject to equitable tolling. However, when assessing whether a state law claim has been timely filed, federal courts borrow that state's equitable rules. *See Casey* v. *Merck & Co., Inc.,* 653 F.3d 95, 100 (2d Cir. 2011) ("[W]e now join the majority of our sister courts that have addressed the issue in holding that a federal court evaluating the timeliness of state law claims must look to the law of the relevant state to determine whether, and to what extent, the statute of limitations should be tolled by the filing of a putative class action in another jurisdiction."); *M.D.* v. *Southington Bd. of Educ.*, 334 F.3d 217, 223 (2d Cir. 2003) ("[A]lthough federal courts do not borrow state rules governing the accrual of claims … they do borrow state equitable tolling rules[.]"); *see also Singh* v. *Wells*, 445 F. App'x 373, 377 (2d Cir. 2011) (summary order); *District Attorney of N.Y. County* v. *Republic of the Philippines*, 307 F. Supp. 3d 171, 199 (S.D.N.Y. 2018) ("The court begins by noting that a federal court sitting in diversity applies the forum state's statute of limitations provisions, as well as

any provisions that govern the tolling of the statute of limitations." (internal quotations and alterations omitted)).  Under New Jersey law, the statute of limitations for NJLAD claims is subject to equitable principles.  *Henry*, 204 N.J. at 333 ("There is nothing new about applying equitable principles to toll the statute of limitations for [NJ]LAD claims, just as it has been done in other areas of the law[.]").  Thus, the Court applies New Jersey's law of equitable tolling to determine whether Plaintiff's NJLAD claims are time-barred.

Under New Jersey law, the limitations period for a claim may be equitably tolled where the plaintiff: (i) has been induced or tricked by his adversary's misconduct into allowing the deadline to pass; (ii) has been prevented from filing suit in some extraordinary way; or (iii) has timely asserted his rights mistakenly in the wrong forum.  *Rowell* v. *Stecker*, 698 F. App'x 693, 965 (3d Cir. 2017) (unpublished decision); *Binder* v. *Price Waterhouse & Co., L.L.P.*, 923 A.2d 293, 298 (N.J. Super. Ct. App. Div. 2007) (citing *Freeman* v. *State*, 788 A.2d 867 (N.J. Super. Ct. App. Div. 2002)); *accord Wolf* v. *PRD Mgmt., Inc.*, No. 11 Civ. 2736 (RMB) (JS), 2012 WL 1044504, at *3 (D.N.J. Mar. 27, 2012).  At the same time, "New Jersey courts have flexibly applied the New Jersey statute of limitations in order to avoid barring litigants on procedural grounds."  *Jaworowski* v. *Ciasulli*, 490 F.3d 331, 335 (3d Cir. 2007).  Indeed, "New Jersey law has been hospitable to equitably purposed procedural devices including ... a principle of equitable tolling[.]"  *Id.*  "A long line of New Jersey cases have held that the filing of an action in one forum will toll the statute of limitations during the pendency of that proceeding so that, if

the action is dismissed without an adjudication on the merits, the plaintiff can, subject to equitable considerations, pursue substantially the same claim in another forum, even if the action is instituted in the second forum after the expiration of the period of limitations." *Staub* v. *Eastman Kodak Co.*, 726 A.2d 955, 965 (N.J. Super. Ct. App. Div. 1999).

In *Jaworowski*, the Third Circuit, predicting what the New Jersey Supreme Court would do, held that the New Jersey personal injury statute of limitations "could be equitably tolled during the pendency of an action brought in a court which lacked *personal jurisdiction* over the defendant[.]" 490 F.3d at 335 (emphasis added); *see also Island Insteel Sys., Inc.* v. *Waters*, 296 F.3d 200, 217 (3d Cir. 2002) ("[T]he sounder rule is to permit equitable tolling where a plaintiff files an initial action in a court that lacks *in personam* jurisdiction over the defendants."); *cf. Zarecor* v. *Morgan Keegan & Co., Inc.*, 801 F.3d 882, 890 (8th Cir. 2015) ("[O]ur best evidence of New Jersey law is that a diligent pursuit of a claim in arbitration also tolls the statute of limitations."). Further, in *Mitzner* v. *West Ridgelawn Cemetery, Inc.*, 709 A.2d 825, 826-28 (N.J. Sup. Ct. App. Div. 1998), the court held that the statute of limitations on a personal injury claim was tolled during the pendency of the plaintiff's case in a court that could not exercise personal jurisdiction over the defendants *and* was also tolled during the time that the plaintiff had to appeal that court's judgment. The court stated explicitly that "tolling does not end before the time to appeal has expired." *Id.* at 828. The court reasoned that the defendants were not

entitled to repose because the plaintiff had pursued the action with reasonable promptness, albeit in the wrong forum. *Id.* at 827-88.

Following New Jersey principles of equitable tolling leads the Court to conclude that Plaintiff's NJLAD claims should be equitably tolled during the pendency of Plaintiff's action in New Jersey and for the time that Plaintiff had to appeal the district court's decision. Since Plaintiff filed his complaint in this Court before his time expired to file a notice of appeal from the District of New Jersey judgment to the Third Circuit Court of Appeals, his NJLAD claims were equitably tolled from the time Plaintiff filed his complaint in New Jersey state court to the time he refiled in this Court. As in *Mitzner*, Plaintiff exercised diligence in pursuing his claims, and timely filed his complaint in New Jersey. Defendants were on notice of Plaintiff's intention to assert his NJLAD claims within the limitations period. In weighing the competing equities presented here, the Court finds no reason to conclude that Plaintiff's NJLAD claims are not subject to equitable tolling. The Court therefore denies Defendants' motion to the extent it seeks the dismissal of Plaintiff's NJLAD claims as time-barred.

### b. Plaintiff Can Assert NJLAD Claims Because He Was Employed in New Jersey

The parties agree that under New Jersey law, Plaintiff can only assert NJLAD claims if he was employed in New Jersey. (*See* Def. Br. 8-9; Pl. Opp. 11 (both citing *McGovern* v. *Southwest Airlines*, No. 12 Civ. 3579 (JBS) (KMW), 2013 WL 135128, at *1 (D.N.J. Jan. 8, 2013) ("New Jersey courts have consistently applied the law of the state of employment to claims of workplace discrimination, and therefore, only apply the NJLAD if the claimant was

employed in New Jersey."))).  "The rationale behind the application of the law of the state of employment is to protect employers from the potential unfairness of having to comply with several different legal regimes merely because they may have employees that reside in different states."  *McGovern*, 2013 WL 135128, at *2.

On the facts, however, the parties diverge:  Plaintiff claims that he was employed in New Jersey because his workplace was his residence in New Jersey.  (*See* Pl. Opp. 11).  Defendants argue that he was employed in Pennsylvania.  (*See* Def. Br. 11).  *First*, Defendants claim that Plaintiff's argument that New Jersey was his place of employment "lacks merit to the extent it is based on the unsupported assertion that working remotely in New Jersey somehow makes New Jersey his place of employment."  (*Id.*).  *Second*, Defendants claim that Plaintiff was hired to work out of and be based at HHD's Pennsylvania location, not as a remote employee in New Jersey.  (*Id.*).

With regard to Defendants' first contention, the Court disagrees.  To the extent that a person is employed to work from his or her home office in New Jersey, as Plaintiff alleges he was, he or she is employed in New Jersey.  The Complaint alleges that: (i) the Company reimbursed Plaintiff for $3,000 in moving costs for him to move to New Jersey; (ii) throughout the course of his employment, Plaintiff worked almost exclusively from his home in New Jersey; (iii) Plaintiff routinely made and received phone calls and sent and received email communications from his home office in New Jersey; (iv) in the course of his three years at the Company, Plaintiff traveled to the Company's

Pennsylvania Office fewer than 20 times; (v) when Plaintiff was required to travel to the Company's Pennsylvania Office, he was reimbursed for his travel expenses; (vi) the Company's human resources representative told Plaintiff that there was a clear understanding when he was hired that he would be working remotely from New Jersey; and (vii) Plaintiff was terminated on a phone call that he took from his home in New Jersey. These allegations are sufficient to establish that Plaintiff was employed in New Jersey.

That the Company does not have a physical office in New Jersey is of no moment. As Plaintiff points out, courts in New Jersey routinely apply the NJLAD to out-of-state employers where the employer has sufficient contacts with the State of New Jersey and the claim arises out of those contacts. *See Bowers* v. *Nat'l Collegiate Athletic Ass'n*, 151 F. Supp. 2d 526, 531 (D.N.J. 2001) ("[A]n 'out of state' defendant may be held liable under the NJLAD if New Jersey's contacts to the factual scenario are sufficient."); *Natarajan* v. *CLS Intern.*, No. 12 Civ. 6479 (CCC), 2014 WL 1745024, *2-3 (D.N.J. Apr. 30, 2014). In *McDonnell* v. *State of Illinois*, 163 N.J. 298 (2000), the New Jersey Supreme Court affirmed the Appellate Division's holding that the NJLAD applies to a New Jersey resident's employment claims against the State of Illinois, where the New Jersey resident worked in the Illinois Department of Revenue's New Jersey Field Office.

The cases cited by Defendants are all distinguishable, as they are all cases in which the plaintiff worked outside of New Jersey. (*See* Def. Br. 9 (citing *McGovern*, 2013 WL 135128, at *1-2 (dismissing plaintiff's NJLAD claim

where he worked exclusively at the Philadelphia International Airport and "ha[d] not alleged that he had any employment responsibilities in New Jersey"); *Buccilli* v. *Timby, Brown & Timby*, 660 A.2d 1261, 1263 (N.J. Super. Ct. App. Div. 1995) (dismissing plaintiff's NJLAD claim where plaintiff "worked exclusively in [Pennsylvania] and the conduct which she alleges was unlawful occurred there."); *Wagner* v. *Catalent Pharm. Sols., LLC*, No. 3:18 Civ. 10065 (PGS) (DEA), 2019 WL 1746308, *4-5 (D.N.J. Apr. 18, 2019) (dismissing NJLAD claim where plaintiff resided and worked in Kentucky); *Walters* v. *Safelite Fulfillment, Inc.*, No. 18 Civ. 11111 (RMB) (JS), 2019 WL 1399550, at *3 (D.N.J. Mar. 28, 2019) (dismissing NJLAD claim where plaintiff resided and was employed in Connecticut); *Satz* v. *Taipina*, No. 01 Civ. 5921 (JBS), 2003 WL 22207205, at *15-18 (D.N.J. Apr. 15, 2003) (granting summary judgment to defendants on NJLAD claim where plaintiff was employed exclusively in Pennsylvania and Delaware); *Brunner* v. *AlliedSignal, Inc.*, 198 F.R.D. 612, 613-14 (D.N.J. 2001) (dismissing NJLAD claim where plaintiff was employed exclusively in Pennsylvania); *Cassidy* v. *Med. Diagnostic Labs., LLC*, No. 18 Civ. 874 (NKL), 2018 WL 6251391, at *1 (W.D. Miss. Nov. 29, 2018) (dismissing NJLAD claim where plaintiff did not allege that she worked in New Jersey); *Norris* v. *Harte-Hanks, Inc.*, 122 F. App'x 566 (3d Cir. 2004) (unpublished decision) (affirming grant of summary judgment to defendants on New Jersey Conscientious Employee Protection Act ("CEPA") claim, where plaintiff was a New Jersey resident but reported to work daily in Pennsylvania). Plaintiff's assertion that he was employed in New Jersey does not rest on the fact that he

resided in New Jersey, but rather the fact that his workplace was his home office in New Jersey.

In *Peikin* v. *Kimmel & Silverman, P.C.*, 576 F. Supp. 2d 654, 657 (D.N.J. 2008), a case that Defendants claim is instructive, the court rejected the plaintiff's theory that "while she was employed in Pennsylvania by a Pennsylvania professional corporation and based out of that corporation's Pennsylvania office, her legal practice frequently took her to New Jersey." The court held that the plaintiff could not assert an NJLAD claim where it was undisputed that the plaintiff worked out of her company's Pennsylvania office, even if she had worked on cases for New Jersey clients and frequently traveled to New Jersey. *Id.* at 658.

*Peikin* is only relevant to the extent Plaintiff was hired to work out of HHD's Pennsylvania Office. However, Defendants' claim that Plaintiff was actually hired to work out of HDI's Pennsylvania office is a factual assertion made only by Defendants in a declaration submitted by HHI's Corporate Counsel. (*See* Dkt. #28). Accordingly, the Court may not consider this fact in resolving the present motion, as it is outside the four corners of the Complaint and not among the limited categories of documents the Court may consider in resolving a motion to dismiss. *See Goel* v. *Bunge, Ltd.,* 820 F.3d 554, 558-59 (2d Cir. 2016); *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 154-55 (2d Cir. 2002). The facts, as alleged in the Complaint, indicate that Plaintiff was hired to work from his home office in New Jersey, and that, save the 20 occasions on which he traveled to the Company's Pennsylvania Office, he in fact *only* worked

from his home office in New Jersey. At this stage of the case, the Court finds that Plaintiff was employed in New Jersey. His NJLAD claims will not be dismissed on this ground.

Finally, the Court need not reach the question of whether Plaintiff can assert a claim under the NJLAD against HHI, HHSMI, or NSO as his joint employers, because those Defendants are dismissed for lack of personal jurisdiction.

## CONCLUSION

For the reasons stated in this Opinion, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.

Defendants' motion is GRANTED insofar as it seeks dismissal of this action against Defendants Harte Hanks, Inc., Harte-Hanks Strategic Marketing, Inc., and NSO, Inc. on personal jurisdiction grounds.

Defendants' motion is DENIED insofar as it seeks dismissal of Plaintiff's NJLAD claims against Harte-Hanks Direct, Inc.

The Clerk of Court is directed to terminate the motion at docket entry 25, and terminate Defendants Harte Hanks, Inc., Harte-Hanks Strategic Marketing, Inc., and NSO, Inc. as parties to this case.

On or before January 6, 2020, Defendant Harte-Hanks Direct, Inc. shall file a responsive pleading.

On or before January 13, 2020, the remaining parties shall submit a proposed Case Management Plan, as well as the joint status letter contemplated by the Plan.

SO ORDERED.

Dated:      December 4, 2019
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge